

UNITED STATES DISTRICT COURT
**SOUTHERN DISTRICT OF FLORIDA**

**02- 60131**

Case No. _____

CIV-GRAHAM



MAGISTRATE JUDGE
TURNOFF

---

SECURITIES AND EXCHANGE COMMISSION, :

　　　　　　　　　　　　Plaintiff, :

　　　　v. :

PATRICK O. WHEELER,
STEVEN S. GALLERS,
ROBERT L. CARBERRY, :

　　　　　　　　　　　　Defendants. :

---

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC") alleges:

### SUMMARY

1.　　This action stems from fraudulent accounting practices by certain officers and employees of CyberGuard Corporation ("CyberGuard"), a publicly-traded computer network security systems manufacturer headquartered in Fort Lauderdale, Florida, during its 1996 and 1997 fiscal years, and the first three quarters of its 1998 fiscal year.

2.　　Following a corporate restructuring at the end of its 1996 fiscal year, the company changed its name from Harris Computer Systems Corporation ("HCSC") to CyberGuard. CyberGuard's new management wrote-off $3.244 million in capitalized software development costs relating to the company's flagship product, the "CyberGuard Firewall Version 2.0" ("Version 2.0"), in the company's 1996 fiscal year annual financial statements. These costs were written-off with the stated justification that they were "worthless," even though CyberGuard



continued to sell and derive substantial value from Version 2.0 during the company's 1997 and 1998 fiscal years. By the write-off, CyberGuard artificially and materially inflated its reported profits and gross profit margin percentage during its 1997 fiscal year and the first three quarters of its 1998 fiscal year.

3.      During its 1997 fiscal year, and in the first three quarters of its 1998 fiscal year, CyberGuard's management also urged its employees to meet earnings and revenue estimates, and failed to devise and maintain effective internal accounting controls. As a result, employees took actions to inflate CyberGuard's reported revenues and/or accelerate CyberGuard's recognition of revenue. This conduct included salesmen directing customers to both omit material contingencies from their purchase orders and backdate their purchase orders, shipping clerks falsifying and backdating shipping records, accounting personnel improperly recording revenue and improperly accelerating revenue recognition on materially contingent, backdated, and fictitious sales transactions, and officers and management condoning, and in some instances, participating in certain of these practices.

4.      During its audit of CyberGuard's 1998 fiscal year financial statements, in August 1998, CyberGuard's outside auditors uncovered information about certain sales transactions that CyberGuard improperly reported as revenue in previous fiscal quarters. Shortly after informing CyberGuard's management about these transactions, the outside auditors resigned.

5.      On August 24, 1998, CyberGuard publicly announced the resignation of its outside auditors, that it had suspended its Chief Executive Officer ("CEO") and Chairman of the company's Board of Directors, defendant Robert L. Carberry, along with its Chief Financial Officer ("CFO"), and that it would be restating its financial results for the third quarter of its 1998 fiscal year.

6.    On the day of the August 24, 1998 public announcement, the price of CyberGuard's common stock, which at the time traded on the NASDAQ National Market, fell approximately 70 percent. In January 1999, NASDAQ de-listed CyberGuard's common stock because the company failed to file its Form 10-K for its 1998 fiscal year and its Form 10-Q for the first quarter of its 1999 fiscal year. CyberGuard's stock now trades on the over-the-counter market through the Pink Sheets LLC.

7.    On August 31, 1999, CyberGuard restated its financial results for its 1997 fiscal year (including all interim quarters and its beginning balance sheet as of July 1, 1996), and for the first three quarters of its 1998 fiscal year. Among other things, CyberGuard's restatement accounted for the improper write-off of capitalized software development costs, and numerous improperly recognized sales transactions.

8.    By engaging in the transactions, acts, omissions, practices, and courses of business alleged herein, defendants Patrick O. Wheeler (CyberGuard's former CFO and Vice President of North American Sales, and its current Vice President of Business Development), Steven S. Gallers (CyberGuard's former staff accountant, Accounting Manager, Controller, and Assistant Treasurer), and Robert L. Carberry (CyberGuard's former Chairman of the company's Board of Directors, CEO, and President), directly or indirectly, violated the antifraud, books-and-records, and internal controls provisions of the federal securities laws. Wheeler and Carberry also, directly or indirectly, made materially false and misleading statements, and omitted to state material facts, to CyberGuard's outside auditors in violation of the federal securities laws.

## JURISDICTION

9.      The defendants, directly and indirectly, have engaged in, and unless restrained and enjoined by this Court will continue to engage in, transactions, acts, practices, and courses of business that violate the following provisions of the federal securities laws:

(a)      as to Wheeler, Gallers, and Carberry, Securities Exchange Act of 1934 ("Exchange Act") Section 10(b) [15 U.S.C. § 78(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

(b)      as to Wheeler, Gallers, and Carberry, Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]; and

(c)      as to Wheeler and Carberry Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

10.     The SEC seeks a judgment that would permanently enjoin all three defendants from future violations of the securities laws and brings this action pursuant to Exchange Act Sections 21(d) and 21(e).  [15 U.S.C. §§ 78u(d) and 78u(e)].  The SEC also seeks an order, pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)], that would permanently bar Wheeler and Gallers from acting as an officer or director of an issuer that has a class of securities registered with the SEC pursuant to Exchange Act Section 12 [15 U.S.C. § 78] or that is required to file reports with the SEC pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)].  Further, the SEC seeks civil penalties against defendants Wheeler, Gallers, and Carberry pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)].

11.     This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices, and courses of business constituting

the violations of law alleged herein occurred within this judicial district. Venue lies in this Court pursuant to Section 27 of the Exchange Act.

12.    In connection with the transactions, acts, omissions, practices, and courses of business described in this Complaint, each of the three defendants, directly and indirectly, used the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange.

## THE DEFENDANTS

13.    Patrick O. Wheeler, age 43, resides in Akron, Ohio, and was CyberGuard's CFO and Vice President of Finance from June 30, 1996 until November 1997. Additionally, in July 1997, Wheeler was appointed CyberGuard's Vice President of North American Sales, a position he held until June 30, 1998. Wheeler has been employed as CyberGuard's Vice President of Business Development from July 1, 1998 to the present.

14.    Steven S. Gallers, age 51, resides in Plantation, Florida, and was hired by CyberGuard as a staff accountant in September 1996. Gallers was named CyberGuard's Accounting Manager in October 1996, a position he held until October 1997, during which time he was also named CyberGuard's Assistant Treasurer in March 1997. Gallers was named CyberGuard's Controller in October 1997, and continued to serve as Controller and Assistant Treasurer until he resigned on or about January 15, 1999. Gallers is a certified public accountant whose certification was inactive during the relevant period.

15.    Robert L. Carberry, age 59, resides in Boca Raton, Florida, and was CyberGuard's CEO and Chairman of CyberGuard's Board of Directors from June 30, 1996 until CyberGuard suspended him in August 1998. Carberry also served as CyberGuard's President from June 30, 1996 to November 1997. Carberry resigned from CyberGuard on December 8, 1998.

## RELATED ENTITY

16.     CyberGuard is a Florida corporation with its principal executive offices in Fort Lauderdale, Florida.   Formerly named Harris Computer Systems Corporation, the company changed its name to CyberGuard following a corporate restructuring on or about June 30, 1996. CyberGuard develops and sells commercial network security products designed to prevent unauthorized users from accessing data on computer networks.   CyberGuard's fiscal year ends June 30.   During the relevant period, CyberGuard's common stock was registered with the Commission pursuant to Exchange Act Section 12(g) and listed on the NASDAQ National Market.   Under the requirements of the Exchange Act, CyberGuard was required to, and did, file with the SEC quarterly reports (Form 10-Qs) and annual reports (Form 10-Ks) that contained financial statements.   In January 1999, the NASDAQ delisted CyberGuard because the company failed to file a Form 10-K for its 1998 fiscal year and a Form 10-Q for the first quarter of its 1999 fiscal year.   CyberGuard's stock presently trades in the over-the-counter market through the Pink Sheets LLC.

## FACTS

I.   **Wheeler and Carberry's Role in CyberGuard's**
     **Improper Write-Off of Capitalized Software Development Costs**

17.     From 1994 through June 30, 1996, the company, while still named HCSC, was engaged in two primary businesses: (i) selling computer network security systems, called "firewalls," and (ii) selling real-time computer systems.   A "firewall" is a means of limiting computer access to authorized persons.   The company's flagship firewall product during this period was the "CyberGuard Firewall Version 2.0" ("Version 2.0").   Version 2.0 was a software/hardware product consisting of HCSC's firewall software operating on the company's "Night Hawk" platform.   The Night Hawk platform was a combination of HCSC's proprietary hardware with a non-proprietary operating system.

18.     Version 2.0 was a profitable product for HCSC, and the product received certain security ratings that made it unique in the firewall market, including a coveted "B1" rating from the National Computer Security Center.   This rating created demand for the product, especially among domestic government customers, which needed the extra level of security a B1-rated product afforded.   The company anticipated that Version 2.0 would also receive an "E3" rating in the company's 1997 fiscal year from a European network security product-rating entity, which it believed would increase Version 2.0's marketability in international markets.

19.     Version 2.0's software component was compatible only with the company's Night Hawk hardware, which was costly to manufacture and thus reduced the product's profit margins. During its 1996 fiscal year, HCSC decided that it wanted to stop manufacturing the Night Hawk hardware and selling real-time computer systems, and switch to a software-only firewall product. By this restructuring, the company hoped to improve its profits and profit margins.   The company

planned to sell its hardware and real-time computer businesses, and phase out Version 2.0 in favor of a software-only product compatible with the industry standard Intel/Unix platform. During its 1996 fiscal year, HCSC began developing a new software-only firewall product that was compatible with the Intel/Unix platform, later to be called the "CyberGuard Firewall Version 3.0" ("Version 3.0").

20.     During HCSC's 1996 fiscal year, certain of the company's management, including Wheeler, who at that time was CFO of HCSC's firewall business, also began planning to write-off the capitalized costs associated with the development of the Version 2.0 firewall software, and charge these costs to the company's 1996 fiscal year. By the write-off, the company could improve its post-restructuring profits and profit margins in its 1997 fiscal year, and improve its financial standing before Version 3.0 was released.

21.     Generally accepted accounting principles ("GAAP"), specifically Statement of Financial Accounting Standards No. 86, Paragraph 10, provide, however, that capitalized software costs may be written off only to the extent that these costs exceed the future net realizable value of the associated asset. Looking forward from the 1996 fiscal year, Version 2.0 still had substantial future value for the company because, among other things: (a) Version 2.0 was the only product the company planned to sell in any substantial quantity in the first quarter of its 1997 fiscal year; (b) there was continuing customer demand for Version 2.0 based on customer satisfaction with the product, the product's B1 rating, and the expected E3 rating; and (c) Version 3.0 was still in an early stage of development and there was substantial uncertainty as to when Version 3.0 would be released and to what extent Version 3.0 could be a viable replacement for Version 2.0 for certain customers.

22.     Despite knowing, or being reckless in not knowing, during the 1996 fiscal year that Version 2.0 would continue to generate substantial value for the company in the 1997 fiscal year, Wheeler began planning to justify the write-off to the company's outside auditors.  Wheeler collaborated on a memo while at HCSC ("the Memo"), which falsely stated, among other things, that in light of the company's planned migration from Version 2.0 to Version 3.0, Version 2.0 was "obsolete" and would "no longer be shipped to customers."  Wheeler would later give the Memo to the company's outside auditors during their audit of CyberGuard's 1996 fiscal year annual financial statements.

23.     Effective June 30, 1996, HCSC carried out its restructuring, selling its hardware manufacturing and real-time businesses, changing its name to "CyberGuard Corporation," and installing new management.

24.     After taking over as CFO of the restructured and renamed company at the start of CyberGuard's 1997 fiscal year, Wheeler began preparing and drafting CyberGuard's 1996 fiscal year annual financial statements, and the notes to these financial statements.  During this period, Wheeler knew, or was reckless in not knowing, that CyberGuard continued to sell and derive substantial value from Version 2.0.  In July and August 1996 alone, Version 2.0 sales accounted for approximately $850,000 in revenues and approximately $327,000 in profits.

25.     While preparing and drafting these 1996 fiscal year annual financial statements, Wheeler also knew, or was reckless in not knowing, that Version 2.0 would continue to generate substantial value for the company throughout the remainder of the 1997 fiscal year.  First, Wheeler signed-off on sales forecasts that management presented to CyberGuard's Board of Directors on August 19, 1996.  Management communicated to Wheeler that in preparing these forecasts, they estimated that Version 2.0 sales would account for a majority of CyberGuard's

revenues in the first quarter of its 1997 fiscal year, and that Version 2.0 would continue to be sold in the second, third, and fourth quarters of the 1997 fiscal year as well. Second, Wheeler knew, or was reckless in not knowing, that it was likely that domestic government and international customers would continue to buy Version 2.0 during CyberGuard's 1997 fiscal year because of its unique B1 rating, and its expected E3 rating. Third, Wheeler knew, or was reckless in not knowing, that the release of Version 3.0 was delayed by problems in development and testing, and that Version 3.0 would be released in October 1996, at the earliest. Fourth, Wheeler knew, or was reckless in not knowing, that in the absence of another firewall product to sell during July, August, and September 1996, CyberGuard's commission-driven salespersons would continue to actively market and sell Version 2.0. Fifth, Wheeler further knew that certain of CyberGuard's vice presidents of sales communicated to him that customers were satisfied with the performance of Version 2.0 and would be reluctant to change products.

26. To prepare for these substantial actual and forecasted Version 2.0 sales, in June 1996, Wheeler negotiated and signed a supplier agreement with the company that purchased HCSC/CyberGuard's Night Hawk hardware manufacturing business, whereby the supplier company agreed to supply CyberGuard with the necessary Night Hawk hardware for a period of one year, subject to renewal for an additional two years. Wheeler later completed a pricing agreement with the supplier company in August or September 1996 that protected CyberGuard until December 1996, and subsequently completed additional pricing agreements that protected CyberGuard into the 1998 fiscal year.

27. In CyberGuard's fiscal quarter ended September 30, 1996, Version 2.0 sales totaled approximately $2.9 million, accounted for approximately 94 percent of CyberGuard's quarterly revenues, and generated approximately $1 million in profits. Based on these actual

sales and profits in the first quarter of the 1997 fiscal year, and based on the sales and profits expected the rest of the year, Wheeler knew, or was reckless in not knowing, that the write-off would be improper.

28.     Nevertheless, Wheeler drafted a note to the financial statements that stated that the costs associated with Version 2.0 were "worthless" in light of the company's migration from Version 2.0 to Version 3.0, and signed CyberGuard's 1996 fiscal year Form 10-K, which was filed with the SEC on October 2, 1996.  In these financial statements, CyberGuard wrote-off all $3.244 million in capitalized software development costs associated with Version 2.0.  By signing off on the write-off, Wheeler knew, or was reckless in not knowing, that CyberGuard's financial statements would thus be materially misstated.

29.     Wheeler also made, directly or indirectly, materially false and misleading statements, and omitted to state material facts, in his communications with the company's auditors.  First, Wheeler provided the outside auditors with the Memo that he collaborated on while at HCSC, dated July 9, 1996, which, as previously described, falsely represented that Version 2.0 was "obsolete" and would "no longer be shipped to customers."  Second, Wheeler repeatedly assured the outside auditors that any future sales and profits from Version 2.0 would be negligible.   Third, Wheeler signed CyberGuard's September 11, 1996 management representation letter, which was given to CyberGuard's outside auditors.  In the letter, Wheeler represented that he was not aware of any material facts that needed to be disclosed in CyberGuard's 1996 fiscal-year financial statements, which was false in light of the actual and forecasted sales of Version 2.0 in the 1997 fiscal year which made the software development costs not "worthless," and which made the write-off improper under GAAP.  Finally, Wheeler attended a September 11, 1996 meeting of the Audit Committee of CyberGuard's Board of

Directors, where the outside auditor discussed its audit results and the appropriateness of the write-off. At the meeting, Wheeler failed to tell the outside auditor that in the first quarter of CyberGuard's 1997 fiscal year, CyberGuard was selling substantial amounts of Version 2.0, and deriving substantial profits from these sales, and that management forecasted that CyberGuard would continue to derive substantial value from Version 2.0 sales the rest of the 1997 fiscal year. Wheeler also failed to tell the outside auditor that in light of the actual and forecasted substantial value attributable to Version 2.0, the write-off was improper under GAAP.

30.    Carberry, also, knew, or was reckless in not knowing, that Version 2.0 would continue to generate substantial revenues for CyberGuard, and the write-off was thus improper, because: (a) Version 2.0 was the only product that CyberGuard was selling in any substantial quantity at the beginning of the 1997 fiscal year; (b) there was continuing customer demand for Version 2.0 based on customer satisfaction with the product, the product's B1 rating, and the expected E3 rating; (c) he signed sales forecasts prepared by management and presented at the August 19, 1996 CyberGuard Board of Directors meeting; (d) Version 3.0 was still in development and there was uncertainty as to the extent which Version 3.0 could be a viable replacement for Version 2.0 for certain customers; and (e) Version 2.0 sales in CyberGuard's fiscal quarter ended September 30, 1996 totaled approximately $2.9 million, and accounted for approximately 94 percent of CyberGuard's first quarter revenues. When Carberry signed CyberGuard's 1996 fiscal-year Form 10-K writing off these costs as "worthless," he thus knew, or was reckless in not knowing, that CyberGuard's financial statements were materially misstated.

31.    Carberry also made, directly or indirectly, materially false and misleading statements, and omitted to state material facts, in his communications with the company's

auditors.  Carberry informed CyberGuard's outside auditors during their 1996 fiscal year audit that future sales of Version 2.0 would be negligible.  He also signed CyberGuard's September 11, 1996 management representation letter to CyberGuard's outside auditors, in which he represented that he was not aware of any material facts that needed to be disclosed in CyberGuard's 1996 fiscal year annual financial statements.  This representation was false or misleading in light of the reasons identified in paragraph 30 for why Carberry knew, or was reckless in not knowing, that the write-off was improper.

32.     After Wheeler and Carberry signed off on the improper write-off, CyberGuard continued to sell Version 2.0 during its 1997 and 1998 fiscal years.  In CyberGuard's 1997 fiscal year, Version 2.0 sales accounted for approximately $8.6 million, or 55 percent, of the company's reported revenues, and approximately $3.1 million, or 36 percent, of the company's reported profits.  In the 1998 fiscal year, Version 2.0 sales accounted for approximately $4.6 million, or 35 percent, of CyberGuard's reported revenues, and approximately $700,000, or 8.2 percent, of the company's reported profits.   By writing off these capitalized software development costs, CyberGuard eliminated its periodic amortization of these costs, and materially improved its reported profits and gross profit margin percentage in its quarterly and annual reports during the 1997 fiscal year, and in the first three quarters of the 1998 fiscal year.

II.     **Wheeler, Gallers, and Carberry's Role in**
        **CyberGuard's Improper Recognition of Revenue**

        A.      **Improper Revenue Recognition Activities at CyberGuard**

33.     As a result of certain misconduct by its officers and employees, CyberGuard improperly recognized revenue on numerous contingent, incomplete, and backdated transactions during its 1997 fiscal year and the first three quarters of its 1998 fiscal year.  Based in part on this

misconduct, CyberGuard materially overstated its reported revenues in its quarterly and annual reports during this period from at least 3.6 percent to at least 32.8 percent.

34.     As described below, Wheeler, Gallers, and Carberry, knew, or were reckless in not knowing, that as a result of their direct or indirect acts and omissions regarding revenue recognition, CyberGuard's reported revenues would be materially misstated.  Also as described below, Wheeler, Gallers, and Carberry circumvented CyberGuard's existing internal accounting controls and/or failed to implement an effective system of internal accounting controls, and falsified CyberGuard's books, records, and accounts.

**B.     Wheeler**

35.     Wheeler knew, or was reckless in not knowing, that CyberGuard often improperly recognized revenue in a manner that was inconsistent both with GAAP and with CyberGuard's publicly stated revenue recognition policy.  Wheeler also knew, or was reckless in not knowing, that CyberGuard materially misstated its reported revenues in its filings with the SEC during its 1997 fiscal year, and in quarters during its 1998 fiscal year.  Nevertheless, Wheeler signed CyberGuard's Form 10-Qs for its fiscal quarters ended September 30, 1996, December 31, 1996, and March 31, 1997, and CyberGuard's Form 10-K for the 1997 fiscal year.  By his acts and omissions, Wheeler also directly or indirectly caused CyberGuard to misstate its reported revenues in the financial statements it filed with the SEC during these periods.

36.     While CFO, Wheeler periodically received internal CyberGuard accounts receivable collections memoranda.  These memoranda reflected efforts by CyberGuard's accounting staff to collect outstanding payments from customers on sales transactions recognized as revenue in previous fiscal quarters. As set forth in these memoranda, certain of these sales transactions were based on material contingencies, including so-called "sell-through" agreements

that made the customer's obligation to pay CyberGuard contingent on the customer's re-sale of CyberGuard's products to an end-user.

37.     Under GAAP, specifically, Statement of Position ("SOP") 91-1, it was improper to recognize revenue on these contingent sales. SOP 91-1 provides that a sale may not be recognized as revenue until it is final and free from material contingency. It was also improper to recognize revenue on these transactions under CyberGuard's publicly stated revenue recognition policy, as set forth in the company's 1997 fiscal year annual financial statements, which adopted the guidelines set forth in SOP 91-1.

38.     Despite knowing, or being reckless in not knowing, about the improperly recognized contingent sales identified in these accounts receivable collections memoranda, Wheeler failed to take adequate corrective action regarding certain of these transactions. As such, Wheeler knew, or was reckless in not knowing, that CyberGuard's reported revenues were materially misstated. Wheeler also knowingly failed to implement an effective system of internal controls that would adequately prevent contingent sales from being improperly recognized in the future.

39.     While CFO, Wheeler also maintained a "debooking schedule," to identify and track certain contingent transactions that he knew, or was reckless in not knowing, CyberGuard had improperly recognized as revenue in previous fiscal quarters. By his debooking schedule, Wheeler selectively subtracted the revenue improperly recognized on certain transactions in earlier reporting periods from the revenue recognized in later reporting periods, instead of reversing the revenue in the quarter in which it was improperly recognized in conformity with GAAP, and implementing internal controls sufficient to prevent improper revenue recognition from occurring again. Wheeler knew, or was reckless in not knowing, that his method of

selectively debooking improperly recognized sales was inconsistent with GAAP, and that CyberGuard's reported revenues were thus materially misstated.

40.     Wheeler did not "debook" certain of the transactions that he knew, or was reckless in not knowing, were improperly recognized in earlier fiscal quarters.  Wheeler allowed these improperly recognized transactions to go uncorrected.  Wheeler knew, or was reckless in not knowing, that by failing to take adequate corrective action regarding these improperly recognized transactions, CyberGuard's reported revenues would thus be materially misstated.

41.     Wheeler, as CFO, also prepared and signed CyberGuard's 1997 fiscal year quarterly and annual filings with the SEC, despite knowing, or being reckless in not knowing, that CyberGuard's reported revenues were materially misstated as a result of numerous improperly recognized contingent sales transactions and his acts and omissions in selectively debooking certain contingent transactions.

42.     Despite knowing, or being reckless in not knowing, that numerous contingent transactions were improperly recognized during CyberGuard's 1997 fiscal year, and that these improperly recognized transactions would cause CyberGuard to materially misstate its reported revenues in its 1997 fiscal-year Form 10-K filed with the SEC, Wheeler signed CyberGuard's September 29, 1997 management representation letter to CyberGuard's outside auditors, made in connection with its 1997 audit.  By this letter, Wheeler falsely represented that he was not aware of any contingent terms or agreements that would impact CyberGuard's ability to recognize revenue on any sales transaction recognized during the 1997 fiscal year.

43.     Wheeler, as CyberGuard's Vice President of North American Sales during the company's 1998 fiscal year, also drafted an April 7, 1998 letter to a customer, which memorialized an agreement that the customer did not have to pay CyberGuard until it resold

CyberGuard's products to an end-user.  CyberGuard recognized the entire $103,817 transaction as revenue in the fiscal quarter ended March 31, 1998, despite the existence of this contingency, and even though CyberGuard did not ship products to the customer until fifteen days after the close of the quarter.  Wheeler knew, or was reckless in not knowing, that CyberGuard's reported revenues in the fiscal quarter ended March 31, 1998 would be materially overstated as a result of his acts or omissions.

### C.    Gallers

44.    Gallers knew, or was reckless in not knowing, during his employment with CyberGuard, first as a staff accountant, then as CyberGuard's Accounting Manager, Controller, and Assistant Treasurer, that CyberGuard frequently recognized revenue in a way that was not in conformity with GAAP or with CyberGuard's publicly stated revenue recognition policy.  As described below, Gallers: (a) engaged in misconduct so that CyberGuard could improperly recognize revenue; (b) took actions to conceal this improper recognition of revenue, including making false and misleading representations to CyberGuard's outside auditors; (c) knowingly circumvented CyberGuard's internal accounting controls; and (d) knowingly falsified CyberGuard's books, records, and accounts.  As a result of Gallers' acts and omissions, CyberGuard materially misstated its reported revenues in its Form 10-Qs for the fiscal quarters ended September 30, 1996, December 31, 1996 and March 31, 1997, its 1997 fiscal-year Form 10-K, and its Form 10-Qs for the fiscal quarters ended September 30, 1997, December 31, 1997, and March 31, 1998.

45.    Gallers was responsible for reviewing incoming customer purchase orders, creating sales invoices based on the terms set forth in these purchase orders, and recording revenue into CyberGuard's internal accounting system based on these sales invoices and other

documents impacting the transaction.  Certain of these incoming customer purchase orders contained contingent terms on their face that Gallers knew, or was reckless in not knowing, precluded CyberGuard from immediately recognizing revenue under SOP 91-1 and under CyberGuard's publicly stated revenue recognition policy.  Gallers knew, or was reckless in not knowing, that CyberGuard recognized revenue on certain of these transactions before the contingent terms were satisfied.  Gallers knew, or was reckless in not knowing, that by ignoring these express contingencies, and by directly or indirectly causing revenue to be recognized on these transactions, CyberGuard would materially misstate its reported revenues.

46.     Certain CyberGuard sales invoices corresponding to purchase orders that contained contingent terms on their face, as described above, failed to reference these contingent terms, although CyberGuard's internal accounting policy required that all material terms impacting a customer's obligation to pay CyberGuard be identified on the sales invoice.  Gallers knew, or was reckless in not knowing, that his failure to comply with CyberGuard's internal accounting policy would result in CyberGuard materially misstating its reported revenues.

47.     Gallers also periodically received internal CyberGuard accounts receivable collections memoranda that tracked contingent transactions prematurely recognized as revenue in earlier fiscal quarters.  Despite knowing, or being reckless in not knowing, about these improperly recognized transactions, Gallers failed to take adequate corrective action as to certain of these transactions.  Gallers knew, or was reckless in not knowing, that by failing to take adequate corrective action regarding these improperly recognized transactions, CyberGuard's reported revenues would thus be materially misstated.

48.     Gallers also knew, or was reckless in not knowing, that certain transactions were subject to contingent terms that were made orally between CyberGuard and the customer, yet

were not identified on the customer purchase order or on CyberGuard's sales invoice. Gallers knowingly caused certain of these transactions to be recognized as revenue before the contingency was satisfied. In one instance, Gallers learned that a $499,711 transaction with Nissin Electric Co. ("Nissin") was subject to a contingency orally agreed to between CyberGuard and Nissin on or about September 30, 1997. By this contingency, Nissin was not required to pay CyberGuard on the transaction unless CyberGuard granted Nissin the exclusive right to distribute CyberGuard products in Japan. Despite being told about this exclusivity contingency, Gallers failed to memorialize this contingency on the corresponding sales invoice, and directly or indirectly caused the entire transaction to be prematurely recognized as revenue in CyberGuard's fiscal quarter ended September 30, 1997 before the contingency was satisfied. As a result, Gallers knew, or was reckless in not knowing, that CyberGuard's reported revenues in the fiscal quarter ended September 30, 1997 were overstated by approximately 12 percent.

49.    Gallers later "debooked" a portion of revenue from the $499,711 Nissin transaction in the fiscal quarter ended March 31, 1998. To conceal the existence of the contingency, he falsely represented to CyberGuard's independent auditor that the products purportedly purchased earlier were outdated, and that CyberGuard had to "restock" Nissin with newer products. Gallers knew, or was reckless in not knowing, that as a result of his conduct, CyberGuard's reported revenues would be misstated in the fiscal quarter ended March 31, 1998.

50.    During CyberGuard's 1998 fiscal year, Gallers also maintained a chart of sales transactions wherein the customer had not paid CyberGuard. Gallers knew, or was reckless in not knowing, that certain of these transactions were improperly recognized in earlier fiscal quarters. The chart expressly described certain of the transactions as contingent sales. Gallers

knew, or was reckless in not knowing, that by failing to take adequate corrective measures with regard to these transactions, CyberGuard's reported revenues would thus be materially misstated.

51.    Gallers was also an architect of CyberGuard's "master purchase order" scheme. Under this scheme, CyberGuard and the customer typically agreed to a target amount of how much the customer hoped to purchase from CyberGuard over the coming months, typically in the hundreds of thousands of dollars. The customer would then submit to CyberGuard a "master purchase order" in this dollar amount, which would not designate the product type or quantity to be purchased. Gallers, or CyberGuard's accounting staff at his direction, would sometimes prepare a "dummy" sales invoice randomly listing products and quantities that would total the dollar amount of the master purchase order. In some instances, Gallers directed that these phony sales invoices be hand-typed outside of CyberGuard's automated accounting system in order to conceal the scheme. CyberGuard's shipping personnel would then ship the customer a "demo" CD or other token item of nominal value, thereby generating a shipping document relating to the phony sales invoice. The customer was obligated to pay CyberGuard only when it periodically sent "follow-up" purchase orders reflecting actual sales that would be offset against the original amount. With regard to at least one master purchase order, Gallers tracked these follow-up orders outside of CyberGuard's automated accounting system. In other instances, the accounting department periodically, at Gallers' direction, issued credit memos and "debooked" revenue to knowingly conceal the scheme. Gallers, directly or indirectly, caused CyberGuard to recognize the entire dollar amount stated on the original master purchase order at the time it was received, even though he knew, or was reckless in not knowing, that this resulted in CyberGuard materially misstating its reported revenues.

52.     Gallers also knew, or was reckless in not knowing, that on certain occasions, CyberGuard shipping personnel backdated shipping documents based on directives by management, so that revenue recognition could be accelerated on certain transactions completed after the close of reporting periods.   Gallers, directly or indirectly, caused CyberGuard to recognize revenue on certain of these backdated transactions.   As such, Gallers knew, or was reckless in not knowing, that CyberGuard's reported revenues would thus be materially misstated.

53.     To conceal the existence of improperly recognized contingent sales transactions, and his scheme regarding master purchase orders, Gallers assured CyberGuard's outside auditors during the 1998 fiscal year that he was not aware of any contingent sales transactions.

**D.     Carberry**

54.     Carberry had certain involvement in CyberGuard's improper revenue recognition activities.   Among other things, around the close of CyberGuard's fiscal quarter ended March 31, 1998, Carberry sent an e-mail to certain of CyberGuard's top officers requesting that revenue projections be met.   In response, Carberry received e-mails and schedules describing actions taken after the close of the quarter to increase revenue numbers by recognizing incomplete sales transactions as revenue.   Carberry knew, or was reckless in not knowing, that CyberGuard improperly recognized revenue on these transactions in the fiscal quarter ended March 31, 1998, thereby materially misstating its financial statements, yet he signed CyberGuard's Form 10-Q for the quarter.

55.     Carberry was also involved in negotiating the oral exclusivity contingency underlying the previously described $499,711 transaction with Nissin.   Carberry knew, or was reckless in not knowing, that CyberGuard improperly recognized revenue on this contingent

transaction in the fiscal quarter ended September 30, 1997, yet he signed CyberGuard's Form 10-Q for the quarter.

## FIRST CLAIM

### (Exchange Act Section 10(b) and Exchange Act Rule 10b-5)

56.    Paragraphs 1 through 55 are realleged and incorporated by reference.

57.    By engaging in the foregoing conduct, Wheeler, Gallers, and Carberry violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### (Exchange Act Section 13(b)(5) and Exchange Act Rule 13b2-1)

58.    Paragraphs 1 through 55 are realleged and incorporated by reference.

59.    By engaging in the foregoing conduct, Wheeler, Gallers, and Carberry violated Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## THIRD CLAIM

### (Exchange Act Rule 13b2-2)

60.    Paragraphs 1 through 55 are hereby realleged and incorporated by reference.

61.    Wheeler and Carberry, while officers of CyberGuard, directly or indirectly, made or caused to be made materially false and misleading statements, or omitted to state or caused another person to omit to state material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with an audit of CyberGuard's financial statements required to be filed with the SEC.

62.     By reason of the foregoing, Wheeler and Carberry violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## RELIEF REQUESTED

WHEREFORE, the SEC respectfully requests that this Court enter a judgment that:

(i)     permanently enjoins Wheeler, Gallers, and Carberry from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(ii)    permanently enjoins Wheeler, Gallers, and Carberry from violating Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1];

(iii)   permanently enjoins Wheeler and Carberry from violating Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2];

(iv)    permanently prohibits Wheeler and Gallers, pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of an issuer that has a class of securities registered with the SEC pursuant to Exchange Section 12 [15 U.S.C. § 78l] or that is required to file reports with the SEC pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)];

(v)     orders Wheeler, Gallers, and Carberry to pay appropriate civil penalties pursuant

to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

(vi)    grants such other relief as the Court deems just or appropriate.


Respectfully submitted,


William H. Kuehnle, D.C. Bar No. 7401
KuehnleW@SEC.gov
(202) 942-4678
(202) 942-9569 (fax)


James J. Bresnicky, D.C. Bar No. 453713
BresnickyJ@SEC.gov
(202) 942-4683
(202) 628-1471 (fax)
Paul R. Berger, D.C. Bar No. 375526
Russell G. Ryan, D.C. Bar No. 414472
Nina B. Finston, D.C. Bar No. 431825

SECURITIES AND EXCHANGE
COMMISSION
450 5th Street, N.W.
Washington, D.C.  20549-0911

Attorneys for Plaintiff


Dated: January 29, 2002

S 44
Rev. 12/96)

# CIVIL COVER SHEET

The JS-.4 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**02-60131**

**CIV-GRAHAM**

## (a) PLAINTIFFS

SECURITIES AND EXCHANGE COMMISSION

## DEFENDANTS

WHEELER, PATRICK O.;
GALLERS, STEVEN S.;
CARBERRY, ROBERT L.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

Broward 02CV60131/DLG

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Summit, OH
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

TURNOFF

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

See attachment

ATTORNEYS (IF KNOWN)

MAGISTRATE JUDGE
TURNOFF  See attachment

1) CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  (BROWARD),  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE  HIGHLANDS,

## II. BASIS OF JURISDICTION  (PLACE AN "X" IN ONE BOX ONLY)

- XX 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN  (PLACE AN "X" IN ONE BOX ONLY)

- XX 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT  (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | | B☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R.R. & Truck | **A PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | ☐ 840 Trademark | XX 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | A☐ 871 IRS — Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | | A OR B |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION  (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78m(b)(5); 17 C.F.R. § 240.13b2-1; 17 C.F.R. § 240.13b2-2; 15 U.S.C. § 78u(d)(2); 15 U.S.C. § 78l; 15 U.S.C. § 78o(d); VII LENGTH OF TRIAL (via _____ days estimated (for both sides to try entire case)  15 U.S.C. § 78u(d)(3).  Violations of the federal securities laws.

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $
Perm. Injunction,
Civil Penalties
Officer/director bar

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ YES  XX NO

## VIII. RELATED CASE(S) IF ANY  (See instructions):

JUDGE  Alan S. Gold

DOCKET NUMBER 98-6879-CIV

DATE  1/29/02

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

ATTACHMENT TO FORM JS-44
Securities and Exchange Commission v. Wheeler, et al.

William H. Kuehnle
James J. Bresnicky
Securities and Exchange Commission
450 5th Street, N.W.
Washington, D.C. 20549-0911
(202) 942-4678 (Kuehnle)

Wallace L. Timmeny
Edward B. Horahan III
Dechert Price & Rhoads
1775 Eye Street, N.W.
Washington, D.C. 20006
(202) 261-3465 (Horahan)

Counsel for Patrick O. Wheeler

Nancy Van Sant, Esq.
Sacher, Zelman, Van Sant, Paul,
    Beiley, Hartman & Waldman
1401 Brickell Avenue
Suite 700
Miami, Florida 33131
(305) 371-8797

Counsel for Defendant Steven S. Gallers

Richard H. Critchlow
Kenny Nachwalter Seymour Arnold
    Critchlow & Spector
1100 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131-4327
(305) 373-1000

Counsel for Robert L. Carberry